UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN MICHAEL-DORMAN BELTOWSKI,

                          Petitioner,              Case No. 5:16-cv-14224
                                                   Hon. John Corbett O'Meara

v.

SHAWN BREWER,

                          Respondent.

_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS
CORPUS,  AND (2) GRANTING PARTIAL CERTIFICATE OF
APPEALABILITY**

This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254.
Petitioner Kevin Michael-Dorman Beltowski was convicted after a jury trial in the
Wayne Circuit Court of second-degree murder, MICH. COMP. LAWS § 750.317. Petitioner
was sentenced as a third-time habitual felony offender to 20 to 40 years in prison.

The petition raises six substantive claims and makes two additional procedural
arguments: (1) the trial court erroneously instructed the jury on self-defense, (2)
insufficient evidence was presented at trial to sustain the verdict, (3) the trial judge's
conduct deprived Petitioner of a fair trial, (4) newly discovered evidence shows that
voluntary drug use was a substantial contributing cause of the victim's death, (5) the
prosecutor engaged in misconduct, (6) Petitioner was denied the effective assistance
of trial counsel, (7) Petitioner is entitled to an evidentiary hearing, and (8) Petitioner
has demonstrated cause to excuse any state court procedural defaults.

The Court finds that Petitioner's claims are without merit. Therefore, the

petition will be denied. The Court will, however, grant Petitioner a certificate of appealability with respect to his self-defense jury instruction claim, but it will deny a certificate of appealability with respect to his other claims.

## I. Background

This case involves the death of Timothy Moraczewski occurring on September 26, 2010. Moraczewski was killed at a marijuana grow-house in Detroit he operated together with Petitioner. The cause of death was asphyxiation. The victim was found by his brother and another man with a nylon strap attached to a rifle that was tightly twisted around his neck. Petitioner admitted he fought with the victim on the date of his death, but he claimed the death was the result of an accident or self-defense after the victim attacked him. The prosecutor's theory was that during the physical altercation Petitioner intentionally killed the victim by continuing to strangle him with the rifle strap after the victim lost consciousness.

At trial, John Bechinski testified he was the forensic pathologist who performed the autopsy on the victim. Dkt. 5-5, at 72. He opined that the cause of death was asphyxia, and the manner of death was homicide. Id. Bechinski noted there was a ligature mark on the victim's neck, indicating that he did not die as the result of manual strangulation, but an implement was used to cut-off blood flow to his head. Id, at 76. Bechinski testified that in cases of strangulation, a person will typically lose consciousness in ten to fifteen seconds, and if pressure is continued to be applied death will typically occur within a few minutes. Id., at 79.

2

Bechinski also did a toxicology analysis on the victim, and he found the presence of hydrocodone and alprazolam (Vicodin and Xanax). Id., at 84. Vicodin is an opiate, and both drugs are sedatives that depress the central nervous system. Id., at 84-85. The levels for both drugs were elevated, meaning the victim may have been sedated at the time of his death. Id., at 88. Bechinski nevertheless opined that asphyxia was the cause of death, and that it was not an overdoes. Id., at 88-89. Bechinski could not say whether the medications were a contributing cause of death. Id., at 89.

Bechinski also noted abrasions and bruises all over the victim's body consistent with him having been in a fight. Id., at 91-92. Bechinski examined the nylon strap of a rifle provided by the police, and he opined that it was consistent with the injury to the victim's neck. Id., at 95.

Among other things, defense counsel cross-examined Bechinski about the drugs found in the victim's system. Dkt. 5-6, at 9-10. Bechinski conceded that he did not know the victim's tolerance for the drugs. Id. Bechinski could not say how the drugs affected the victim. Id., at 11.

Jeffrey Moraczewski testified he was the victim's brother. Id, at 50-51. Moraczewski knew Petitioner for seventeen years, and he had worked for Petitioner's roofing company. Id., at 52-53. Moraczewski testified the victim also worked for and had been long-time friends with Petitioner. Id., at 54.

Aside from the roofing business, Petitioner ran a marijuana grow operation at a house located in Detroit. Id., at 57-58. Petitioner financed the operation by renting the house and providing the equipment, and Petitioner stayed at the house to watch

3

over the operation. Id., at 58-59. The operation was going on for about two years at the time of the victim's death. Id., at 61.

Moraczewski explained that his brother had a bad knee and bad back from roofing, so he worked exclusively at the grow operation. Id., at 62. The victim took pain medications as a result of his roofing injuries. Id., at 63-64. Moraczewski believed Petitioner and the victim shared equally in the profits from the grow house. Id., at 66.

At the time of his brother's death, Moraczewski testified that there was tension between Petitioner and the victim. Id., at 67. Petitioner wanted to start a second grow house without the victim. Id., 68. Petitioner planned to remove the equipment from the house where the victim stayed and move it to a second house where Petitioner's brother would take over operations. Id., at 68. Petitioner spoke to Moraczewski about how he would need to sneak the equipment out of the house, and that the house was in foreclosure anyway. Id., at 69-70. Another source of tension between the two men was the fact Petitioner and the victim were competing over the affections of the same women. Id., at 71-75.

On Sunday evening, September 26, 2010, Moraczewski received a phone call from Petitioner's number which he initially ignored. Id., 82. A few seconds later Moraczewski received a text message from Petitioner stating, "911. Call me now." Id., at 83. Moraczewski called Petitioner back. Petitioner told Moraczewski that he just had a fight with the victim, and "I choked your brother out with his own fuckin' gun." Id., at 86. Petitioner explained to Moraczewski that "I choked him out until he turned purple. And I held it for another thirty seconds." Id.

4

Petitioner told Moraczewski the fight started when Petitioner told the victim he was going to remove the grow equipment. Id., at 88. The victim was angry and shot a round into the wall next to Petitioner with his rifle. Id., at 89. The men then began to fight, and Petitioner got on top of the victim. Id. Petitioner said he was able to unsheathe the victim's knife from his side. Petitioner pointed the knife at the victim's face, but then he threw it across the room. Id., at 92-93. Petitioner did not tell Moraczewski there was a struggle for control of the rifle. Id., at 98.

Petitioner told Moraczewski that when he was choking his brother with the rifle strap, the victim tried to "tap out," meaning he was indicating he wanted to give-up. Id., at 100. Petitioner told Moraczewski he responded to the victim, "Do you think I'm gonna let you tap out this time, bitch?" And then he continued to choke the victim for another thirty seconds. Id., at 101. Petitioner told Moraczewski that his brother was "not as strong as he thinks he is. He's a pussy." Id.

Moraczewski asked Petitioner if he killed his brother. Id., at 102. Petitioner answered that the victim was still breathing when he left the house. Id., at 102. Petitioner told Moraczewski with a sense of urgency that he better go over to the house, however, to see if the victim was still alive. Id., at 102. Moraczewski was very concerned, and he immediately called his sister and brother-in-law so they could go together to the house. Id., at 102-03.

Shortly thereafter Moraczewki arrived at the house with his brother-in-law. They went inside and found the victim lying on a couch. Id., at 107-13. Items were thrown everywhere. Id., at 114. The victim's body was twisted in a strange position. Id.,

5

at 114. Moraczewski saw a strap wrapped around his brother's neck. Id. He appeared to be dead. Id., at 116. Moraczewski tried to take the strap off, but it was too tight to even fit a finger underneath it. Id., at 117. Finally, he rotated the rifle attached to the strap four times to loosen and remove it. Id., at 119-122. They then drove the victim to a near-by hospital where he was declared dead. Id., at 123. Moraczewski called Petitioner to tell him that the victim was dead, and Petitioner responded by text, stating, "Tell me this is a joke." Id., at 105. Moraczewski subsequently told the police everything Petitioner told him and what he saw when he arrived at the grow house. Id., at 132 ff.

Michael Mitchell testified he was Jeffrey Moraczewski's brother-in-law. Dkt. 5-7, at 23. He had known the victim for eighteen years, and he had known Petitioner for about seven years. Id., at 24. He testified that on the date of his death, he received a text message from the victim at 5:45 p.m., lamenting the Detroit Lion's recent loss. Id., at 29-30. About fifteen to twenty minutes later, he got the message from Moraczewski about Petitioner's call. Id., at 31, 35. Moraczewski picked him up and they drove to the victim's house. Id. They got to the house around 6:30 p.m. Id., at 34.

Mitchell saw the victim lying on the couch. Id., at 35. He appeared to be. Id., at 35-36. Mitchell saw the strap attached to the victim's neck and the rifle on his back. Id. He could not get his finger between the strap and the victim's neck. Id., at 38. Mitchell heard Moraczewski yell, "You didn't loosen the strap," as if he were speaking to Petitioner. Id., at 39-40. The strap was twisted around the back of the victim's neck, and they had to rotate the rifle at least three times to remove it. Id., at 42.

6

Detroit Police Officer Frank Hilbert testified he spoke with Moraczewski at the hospital, and Moraczewski told him what Petitioner told him on the phone. Id., at 124-147. Moraczewski told Hilbert that Petitioner said he choked-out the victim after they had a fight. Id., 148. Moraczewski told Hilbert about Petitioner's statements regarding wrapping the gun around victim's neck and holding it there for thirty seconds. Id, at 148-49. He continued to twist the strap until the victim's lips and face turned purple. Id., at 150.

Defense counsel examined Detroit Police Officer Allen Williams about the lack of forensic evidence collected at the scene. Id., at 148-170.

Gerald Kapinsky testified for the defense. Kapinsky said he was friends with both Petitioner and the victim. Dkt. 5-9, at 66-104. Kapinsky stopped his relationship with the victim because Kapinsky was concerned about his and his family's safety. Id., at 74. The victim had a reputation of being "different, weird . . . kind of scary," Id., at 78-79, wanting "to go out and, and beat somebody up," and he was "psychotic." Id., at 81. The victim carried a rifle and knife at all times, and he had shot four or five males with birdshot from a shotgun at Finney High School which was located directly across the street from the grow house. When Tim was at the grow house he was always armed. Id., at 121. Kapinsky testified that when the victim was on Vicodin he was "definitely stronger," but the Xanax made him slow down. Id., at 123. The victim had a big bottle of Vicodin that he would "eat" every morning. Id.

Petitioner testified in his own defense. He testified that the day before the incident, he tried to come to the grow house, but the victim told him to come the next

day. Id., at 191. When Petitioner arrived the next day just before 6:00 p.m., the victim had a rifle slung over his neck and a knife strapped to his side. The victim was agitated and was angry about Petitioner's visit. Id.

Petitioner testified the grow operation needed to be moved because the house was in foreclosure. Petitioner suggested to the victim they split up the operation with the victim keeping the plants and Petitioner taking the equipment. Id., at 198. The victim became very angry at this suggestion, so Petitioner sat on the couch because he did not want to fight. Id., at 201-204. Nevertheless, the victim pointed the rifle at Petitioner and said, "You think I'm gonna let you walk out of here, like that . . . tell me I won't shoot you." Id., at 204-207. The victim  tried to fire the rifle, but the safety was on. He then fired a shot past Petitioner's head that hit the wall. Id., at 207-208. Subsequent investigation, in fact, discovered a bullet hole through a wall in the house.

Petitioner threw his hands in the air and told the victim to take everything, and the victim stepped back. Id., at 208. Petitioner then tried to leave the house, but the victim grabbed him at the door and said, "You're not going anywhere." Id. The two men began to wrestle and landed on the couch. Id., at 211. Petitioner testified he grabbed the barrel of the rifle as the victim began to point it at him. Id., at 211. Petitioner fell on top of the victim, and he kept telling the victim to stop as he attempted to point the rifle at him. Id., at 213-14.

When the victim did not stop, Petitioner felt his life was in danger, so he let go of the rifle and grasped the strap and applied pressure. Id., at 214. Petitioner testified he never twisted the strap like a tourniquet. Id., at 217. The victim rolled over and

8

stood up, but Petitioner managed to hold onto the strap. Id, at 218-19. The victim tried to "tap" and give up, but Petitioner did not release the pressure on the strap because he was afraid for his life. Id., at 219-20.

Petitioner pulled the victim back onto him and they both fell onto the couch. Petitioner was lying on his back, and the victim was lying on top of him with his back to Petitioner. Id., at 221-22. Petitioner could see the side of the victim's face and saw that he lost consciousness, and he held the strap tight against his neck for another three second. Id., at 223. Petitioner saw and heard that the victim still breathing, so he found his keys and left the house. Id., at 223-24.

On cross-examination, Petitioner testified he left the house as soon as the victim lost consciousness. Dkt. 5-10, at 78. He denied he told Jeffrey that he continued to apply pressure for an additional thirty seconds after the victim was unconscious. Id., at 78. He denied he twisted the strap around the victim's neck on purpose, and he did not know it was twisted when he left the house. Id., at 81.

Once he was back in his truck Petitioner called the victim's brother, believing the victim was still alive. Dkt. 5-9, at 226. Petitioner asked him to contact the victim and attempt to reason with him. When Petitioner learned that Jeffrey did not hear back from the victim, Petitioner said he should go to the house and check on him. Id., at 229.

Based on this evidence the jury found Petitioner guilty of second-degree murder, and he was sentenced as indicated above.

Following his conviction and sentence, Petitioner filed a claim of appeal in the

Michigan Court of Appeals. His appellate brief raised four claims:

> I. The cumulative effect of the prosecutor's misconduct denied defendant a fair trial.
>
> II. Trial court error infringed on defendant's due process rights to a fair trial.
>
> III. Ineffective assistance of counsel denied Defendant a fair trial.
>
> IV. The cumulative effect of error requires that appellant be granted a new trial.

The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Beltowski*, No. 304254, 2012 WL 4800241 (Mich. Ct. App. Oct 9, 2012).

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims as in the Michigan Court of Appeals, and adding an additional claim:

> I. Defendant-Appellant's appellate counsel was ineffective where she failed to raise non-frivolous issues on appeal and failed to offer Defendant-Appellant the necessary assistance he needed to file a timely Standard 4 supplemental brief on appeal.

The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Beltowski*, 493 N.W.2d 968 (Mich. 2013) (table).

Petitioner subsequently returned to the trial court and filed a motion for relief from judgment. The motion raised five claims:

> I. Defendant Beltowski was denied due process of law and a fair trial when an erroneous self-defense instruction was given, which deprived him of the defense by instructing the jury that he could not claim self-defense if: (1) he "acted wrongfully," (2) "brought on the assault," (3) "and was limited to using self- defense only, to protect himself from the

10

imminent unlawful use of force by another," and (4) only for such time "as it seems necessary for the purpose of protection."

II. Newly discovered evidence that high levels of hydrocodone and alprazolam ingested by the deceased significantly contributed to his death requires a retrial.

III. The verdict was against the great weight of evidence.

IV. Defendant Beltowski was denied his right to effective assistance of counsel when 1) he failed to investigate and present toxicology evidence that the high levels of hydrocodone and alprazolam significantly contributed to the death, 2) failed to object to an erroneous jury instruction on self-defense, and 3) failed to object to specific instances of professional misconduct in the prosecutor's closing argument.

V. The prosecutor engaged in misconduct in his closing argument by vouching for his witness and arguing matters not in evidence. Defendant Beltowski has met the procedural requirements of good cause and actual prejudice under MCR 6.508(D) and an evidentiary hearing is required.

The trial court denied the motion for relief from judgment. Dkt. 5-18. The court found that review of Petitioner's new claims were barred under Michigan Court Rule 6.508(D)(3), and because he had failed to demonstrate "merit in any of the . . . arguments posited." Id., at 8.

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the same claims. The Michigan Court of Appeals denied the application for failure to establish entitlement to relief under Rule 6.508(D). *People v. Beltowski*, No. 326192 (Mich. Ct. App. June 22, 2015). Petitioner then applied for leave to appeal in the Michigan Supreme Court, but that court also denied leave to appeal with citation to Rule 6.508(D). *People v. Beltowski*, 882 N.W.2d 130 (Mich. 2016) (table).

11

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas

cases:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal
> > law, as determined by the Supreme Court of the United
> > States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented
> > in the State court proceeding.

A state court adjudication is "contrary to" Supreme Court precedent under §

2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth

in [Supreme Court] cases" or "if the state court confronts a set of facts that are

materially indistinguishable from a decision [of the Supreme Court] and nevertheless

arrives at a [different result]." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal

quotation marks omitted).

> Under the "unreasonable application" clause of § 2254(d)(1),
>
> even clear error will not suffice. Rather, as a condition for obtaining
> habeas corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court was so
> lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement.

12

*White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (citations, quotation marks, and alterations omitted).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015). "Federal habeas review thus exists as 'a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). "[W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Renico v. Lett*, 559 U.S. 766, 778 n.3 (2010). The question is whether the state court's application of federal law was "objectively unreasonable." *White*, 134 S. Ct. at 1702. In short, the standard for obtaining federal habeas relief is "difficult to meet . . . because it was meant to be." *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 16, 187 L. Ed. 2d 348 (2013)(internal quotation marks omitted).

## III. Analysis

A. Procedural Default

Respondent contends that several of Petitioner's claims are procedurally defaulted because the errors were not preserved at trial or on direct appeal. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if a state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.

13

See *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, procedural default is not a jurisdictional bar to review of a habeas petition on the merits. See *Trest v. Cain*, 522 U.S. 87, 89 (1997). Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the petitioner's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In the present case, the Court deems it more efficient to proceed directly to the merits, especially because Petitioner alleges that his attorneys were ineffective for failing to preserve the defaulted claims.

### B. Jury Instructions

Petitioner first claims his trial was rendered fundamentally unfair when the trial court deviated from the language of Michigan's Standard Jury Instructions and erroneously instructed the jury on the law of self-defense. This claim was raised in the state courts in Petitioner's motion for relief from judgment. The trial court found the claim defaulted under Michigan Court Rule 6.508(D)(3), but it also found that Petitioner had failed to demonstrate plain error. Aside from its procedural default argument, Respondent asserts that the rejection of the claim for "plain error" by the state trial court did not involve an unreasonable application of established Supreme Court law. See *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009) (holding that

claim reviewed for "plain error" is entitled to AEDPA deferential standard); c.f. *Frazier v. Jenkins*, 770 F.3d 485, 497 n. 5 (6th Cir. 2014) (stating in dicta that plain error review is not an adjudication on the merits).

The trial court instructed the jury on self-defense as follows:

The defendant does not have to prove that he acted in self-defense; instead, the prosecutor must prove, beyond a reasonable doubt, that the defendant did not act in self-defense.

The defendant claims that he acted in lawful self-defense.

A person has the right to use force to defend himself under certain circumstances.

If the defendant is found to have acted in lawful self-defense, his actions are justified, and he is not guilty of homicide, murder, first degree, premeditated, of Timothy Moraczewski, and the less serious offense of murder second degree, and voluntary manslaughter of Timothy Moraczewski.

You should consider all the evidence and use the following rules to decide whether the defendant acted in lawful self-defense. Remember to judge the defendant's conduct according to how the circumstances appeared to him at the time he acted.

First, at the time he acted, the defendant must not have been engaged in the commission of a crime.

Second, when he acted, the defendant must have honestly and reasonably believed that he had to use force to protect himself from the imminent unlawful use of force by another.

If his belief was honest and reasonable, he could act at once, to defend himself, even if it turns out later that he was wrong about how much danger he was in.

Third, a person is only justified in using the kind of force that was appropriate to the attack made and the circumstances as he saw them.

When you decide whether the force used was what seemed

15

necessary, you should consider whether the defendant knew about any other ways of protecting himself. But you may also consider how the excitement of the moment effected the choice the defendant made.

Fourth, the right to defend one's self only lasts as long as it seems necessary for the purpose of protection.

Fifth, the person claiming self-defense must not have acted wrongfully and brought on the assault.

However, if the defendant only used words, that does not prevent him from claiming self-defense if he was attacked.

Dkt. 5-11, at 99-101.

Petitioner raises multiple objections to this instruction. First, he asserts the fifth listed element that the defendant not act "wrongfully" to be able to claim self-defense is overly broad because self-defense is only precluded under Michigan law when the defendant is committing a crime. Petitioner asserts that as instructed the jury might have erroneously rejected the defense if it believed Petitioner merely acted morally wrongfully. Second, Petitioner likewise asserts that the fifth element of the instruction erroneously precludes self-defense if the defendant "brought on the assault." He asserts that under this language the jury might have erroneously rejected the defense if it believed Petitioner "brought on the assault" by coming over the house to remove the equipment. Third, Petitioner asserts that the instruction erroneously required the decedent to use unlawful force for Petitioner to claim self-defense, and the jury was never instructed on how to determine whether the use of force by the victim was lawful. Fourth, Petitioner asserts that the instruction erroneously instructed the jury that self-defense is available only "as long as it seems necessary for the purposes of

16

protection." Petitioner asserts that the instruction fails to define what is meant by
"seems necessary" and "protection." Finally, Petitioner asserts that the instruction
failed to include language that self-defense permits the use of deadly force, and it failed
to list factors for the jury to consider in determining whether the accused had a
reasonable belief of death or serious bodily injury.

The trial court rejected the claim in the alternative on the merits as follows:

> Under the facts of this case, this Court is persuaded that the error
> involved here was not decisive of the outcome. Defendant presents
> winding arguments regarding the trial court instructing the jury that if
> he acted wrongfully or brought on the assault, he would not be afforded
> the right to claim self-defense, which erroneously precludes his use of
> self-defense. However, both of these terms essentially describe a person
> who is the aggressor, or initiator of an altercation cannot turn around and
> escalate or use deadly force, if the other person chooses to fight back.
> Here, the jury was given the choice to either believe the events as
> testified to by the defendant, or as laid before them by the prosecution.
> Conversely, if the jury did believe the defendant, he would have been
> protected under the [Self-Defense Act], even if he used deadly force.
> Ultimately, the jury did not believe the defendant's testimony, and
> deemed him the aggressor in this situation. As such, this Court finds
> there was no error with defendant's jury instructions, and defendant is
> unable to avoid forfeiture of this issue because he has not established that
> he was prejudiced by the court's plain error . . . .   In light of the trial
> court's instructions and the evidence presented, there is no basis for
> concluding that the error seriously affected the fairness, integrity or
> public reputation of judicial proceedings.

Dkt. 5-18, at 5.

This decision, though failing to address each of  Petitioner's objections to the
self-defense instruction individually, did not involve an unreasonable application of
clearly established Supreme Court law. The burden of establishing that an
instructional error warrants habeas relief rests with a habeas petitioner, and the

burden is a heavy one. The question in a collateral proceeding–such as Petitioner's motion for relief from judgment or this habeas proceeding–is not merely whether the challenged "instruction is undesirable, erroneous, or even 'universally condemned,' but [whether] it violated some right which was guaranteed . . . by the Fourteenth Amendment." *Donnelly v. DeChristofo*, 416 U.S. 637, 643 (1974). In other words, the relevant inquiry is "whether the ailing instruction so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quotation omitted).

When assessing the propriety of a challenged instruction, a court must not view the instruction in isolation but must consider it within the context of the entire jury charge and the evidence introduced at trial. *Jones v. United States*, 527 U.S. 373, 391 (1999). An incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977). Every ambiguity, inconsistency or deficiency in a jury instruction does not, standing alone, necessarily constitute a violation of due process. *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009). To warrant habeas relief, it is not enough that there might be some "slight possibility" that the jury misapplied the instruction. *Id*. at 191.

Petitioner's argument has some force. The instruction read by the trial court deviated from Michigan's standard instruction on self-defense and the language of Michigan's Self-Defense Act. See Mich. Comp. Laws 780.972(1); Michigan Criminal Jury Instructions 2d, 7.15. The Self-Defense Act allows a person to use deadly force if: (1) he is not engaged in the commission of a crime at the time he uses force, (2) he is

18

at a place he has a legal right to be, and (3) he honestly and reasonably believes that the use of deadly force is necessary to prevent immanent death or great bodily harm to himself of another person. *Id.* The statute modified the traditional duty to retreat rule, but did not replace the common law right to self-defense. *People v. Guarjardo*, 300 Mich. App. 26, 38 (2013).

Petitioner posits a number of hypothetical findings the jury might have made that would have led them to erroneously reject self-defense under the instructions as read. He asserts that the jury might have found that Petitioner acted "wrongfully" and "brought on the assault" by going to the house and arguing with the victim, and as a result rejected self-defense under the trial court's fifth instructed element of self-defense though such a finding does not negate a valid self-defense claim under Michigan law. He similarly asserts that the jury–without further guidance–might have found that the victim's use of force was lawful, thus erroneously precluding self-defense under the trial court's second instructed element. Finally, Petitioner hypothesizes that the jury might have rejected the defense under the erroneous belief that force was no longer required "for purposes of protection," an undefined term of the instructed fourth element.

Given the evidence presented at trial and the arguments presented by the parties at trial, however, there is no reasonable probability that the jury rejected Petitioner's self-defense claim on any of these hypothetical bases. This might be a different case if Petitioner had shot the victim and instantly killed him during the course of an active fight. In such a case there might have been close questions about

19

whether Petitioner honestly and reasonably was in fear for his life while the victim was conscious and armed and fighting. But the evidence presented at trial indicates Petitioner rendered the victim unconscious by strangling him with the rifle strap. The medical examiner testified that a person would have been rendered unconscious, and obviously helpless, after ten to fifteen seconds of being strangled with a ligature. Petitioner told the victim's brother minutes after the incident that he "choked out" the victim, and he held the strap tight for another thirty seconds after he passed-out.

The problem for Petitioner and his defense is the period of time after he rendered the victim helpless. At that point, the victim was unconscious and no longer presented a threat. According to Petitioner, the victim was still breathing and he immediately left without knowing that the rifle strap was wrapped around the victim's neck. But this testimony runs contrary to the testimony of the victim's brother who said that Petitioner told him that he continued to choke the victim for another thirty seconds after he lost consciousness. Though Petitioner testified that the victim's brother was lying about this statement, the brother told a police officer the same thing hours after the incident at the hospital. Additionally, both the victim's brother and Mitchell found the victim with the strap twisted around his neck so tightly that they could not get their fingers underneath it.

Given this evidence, there is no substantial probability that the jury erroneously rejected self-defense because it thought that Petitioner's conduct after he rendered the victim unconscious was merely "wrongful," that the victim was using lawful force at that point (he was unconscious), or that the  continued use of force was required for

"purposes of protection." That is, none of the hypothetical findings posited by Petitioner applied to the facts of the case after Petitioner rendered the victim unconscious and helpless. After Petitioner refused to allow the victim to "tap out," a reasonably debatable act of self-defense turned into a clear case of murder.

The Supreme Court has held that in determining whether to grant relief to a habeas petitioner based upon an erroneous jury instruction, a reviewing court must determine whether the instruction had a substantial and injurious effect or influence on the jury's verdict. *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The Court concludes that Petitioner is not entitled to habeas relief because any errors in the self-defense instruction did not have a substantial and injurious effect or influence on the verdict in light of the lack of evidence to support Petitioner's self-defense claim and the strong evidence indicating that Petitioner murdered the victim after he rendered him unconscious.


C. Sufficiency of the Evidence

Petitioner asserts in his second claim there was insufficient evidence presented at trial to prove he did not act in self-defense. He also asserts the great weight of the evidence was contrary to the jury's verdict. Neither claim presents a cognizable issue.

With respect to the great weight of the evidence, Petitioner's argument is a state-law claim that is not reviewable by a federal court in a habeas proceeding. See *Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007); *Cukaj v. Warren*, 305 F. Supp. 2d 789, 796 (E.D. Mich. 2004) ("A federal habeas court . . . has no power to grant

21

habeas relief on a claim that a state conviction is against the great weight of the evidence.").

With respect to the sufficiency of the evidence to disprove self-defense, the claim is non-cognizable on habeas review because it cannot be supported by clearly established by Supreme Court law. Under Michigan law, self-defense is an affirmative defense. See *People v. Dupree*, 486 Mich. 693, 704, 712 (2010). "An affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" *People v. Reese*, 491 Mich. 127, 155, n. 76 (2012)(quoting *Dupree*, 486 Mich. at 704, n. 11). Although under Michigan law the prosecutor is required to disprove a claim of self-defense or defense of others, See *People v. Watts*, 61 Mich. App. 309, 311 (1975), "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required. . . ." See *Smith v. United States,* 568 U.S. 106, 133 S. Ct. 714, 719 (2013) (quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)). The Supreme Court and the Court of Appeals for the Sixth Circuit have rejected the argument that the Constitution requires the prosecution to disprove self-defense beyond a reasonable doubt. See *Gilmore v. Taylor*, 508 U.S. 333, 359 (1993)(Blackmun, J., dissenting) ("In those States in which self-defense is an affirmative defense to murder, the Constitution does not require that the prosecution disprove self-defense beyond a reasonable doubt"); *Martin v. Ohio*, 480 U.S. 228, 233-36 (1987); see also *Allen v. Redman*, 858 F. 2d 1194, 1197 (6th Cir.1988) (explaining that habeas review of sufficiency-of-the-evidence claims is limited to elements of the crimes as defined by state law and citing *Engle v. Isaac*, 456 U.S. 107 (1982), and *Duffy v.*

22

*Foltz*, 804 F.2d 50 (6th Cir. 1986)). Therefore, "the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Caldwell v. Russell*, 181 F.3d 731, 740 (6th Cir. 1999).

In any event, even if this claim was cognizable Petitioner would not be entitled to habeas relief. The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original). A federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. See *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). For a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 132 S. Ct. 2060, 2065 (2012).

As indicated above, under Michigan law one acts lawfully in self-defense if he honestly and reasonably believes that he is in danger of serious bodily harm or death as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F.3d 712, 713, n. 1 (6th Cir. 1999)(citing *People v. Heflin*, 434

23

Mich. 482 (1990)). There was evidence presented at trial supporting Petitioner's claim of self-defense for the period of time prior to rendering the victim unconscious. But the prosecution presented evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Petitioner did not act in self-defense. The medical examiner testified that a person who is strangled will lose consciousness in seconds, but death will not result unless pressure is applied for an additional period of a few minutes. The victim's brother testified to statements made by Petitioner that he "choked out" the victim, did not let him "tap out," but instead he continued to strangle him for another thirty seconds. What is more, the victim's brother and brother-in-law found the rifle strap twisted tightly around victim's neck like a tourniquet. Viewing the evidence presented most favorably to the prosecution, sufficient evidence was presented to disprove self-defense. The claim is without merit.


D. Trial Judge's Conduct

Petitioner's third claim raises several objections to the conduct of the trial judge. He argues the trial judge, (1) improperly questioned the medical examiner, (2) denied the jury request to review Petitioner's testimony during their deliberations, and (3) failed to grant a mistrial motion after the prosecutor committed misconduct.

A defendant has a right to a trial before an impartial judge. *Tumey v. Ohio*, 273 U.S. 510, 535 (1927). But comments that do not exhibit favoritism or antagonism for a party are insufficient to establish judicial bias. *See Liteky v. United States*, 510 U.S. 540, 555 (1994). Indeed, "expressions of  impatience, dissatisfaction, annoyance, and

24

even anger" are insufficient to show bias. *Id.* at 555-56.

1. Questioning Medical Examiner

Petitioner asserts the following exchange with the trial judge during the examination of the medical examiner was improper and prejudiced his defense:

Q. (Prosecutor): If that [strap] was put around your neck, right now, would that be loose?

A. Um, if it were just strung around my neck?

Q. Correct.

A. It would be loose?

Q. Thank you. In order to cause strangulation, or, or the tourniquet example that we gave you, would that weapon have to be turned, because of this, the length of the strap?

A. Yes.

Q. This -- is that an adjustable strap, sir?

A. It does not appear to be. It appears to be knotted at both of its attachment sites.

Q. Okay. Knotted at both attachment sites?

A. Yes, sir.

Q. Okay.

THE COURT: Um, I have to beg to differ with you. This is an adjustable strap. Does it not have a buckle on it?

THE WITNESS: There is a buckle. However--

THE COURT: Is it just one strap?

THE WITNESS: It is one strap.

THE COURT: But isn't it looped at one end?

Dkt. 5-6, at 40-41.

The Michigan Court of Appeals' decision rejecting this claim was reasonable:

> While the trial court made an inappropriate statement, the trial court reinforced that it was within the province of the jury to ultimately decide issues of fact concerning the strap. For example, after the trial court "publish[ed] the rifle" for the jury, it stated, "Now, if this sling is adjustable, do not move it right now." The trial court then signaled to the jury that it could "do with it what you wish" with the rifle and strap during deliberations. Most importantly, the fact that the trial court believed that the strap was adjustable did not obviously contradict defendant's testimony that the strap was loose as he left the Cadieux residence, and, therefore, defendant has failed to establish prejudice from the comment.

> Additionally, the jury was later instructed to disregard any of the trial court's comments. The trial court also instructed the jury regarding its role in determining the facts of the case. Because jurors are presumed to follow such instructions, *Matuszak*, 263 Mich. App. at 58, and for the reasons discussed above, defendant has failed to establish that the comments constituted plain error affecting substantial rights.

*Beltowski*, 2012 WL 4800241, at *5.

As noted by the state appellate court, the trial court's observation that the rifle strap appeared to be adjustable was favorable to the defense. The prosecutor was attempting to elicit testimony from the medical examiner that because the strap was *not* adjustable–that is, it could not be lengthened–twisting it around an object would necessarily tighten it like a tourniquet. The trial judge thought the strap appeared to be adjustable–opening the possibility that it could be lengthened and loosened despite twisting. The questioning did not prejudice the defense, and the rejection of the claim

26

was reasonable.

2. Jury Request to Review Evidence

Petitioner next asserts the trial court committed error in its response to the deliberating jury's request to review testimony. During deliberations the jury sent out two notes requesting to see the video statement of Jeffrey Moraczewski and a copy of Petitioner's testimony. The trial judge allowed the jury to see the video statement of Moraczewski but denied the jury's request with respect to Petitioner's testimony. The Michigan Court of Appeals found the claim was without merit because preparing the 270-pages of testimony would have caused a significant delay in deliberations, and in any event, the prosecutor's thorough cross-examination of Petitioner was more harmful than beneficial to the defense. *Beltowski*, 2012 WL 4800241, at *5-6.

This claim fails because it cannot be supported by clearly established Supreme Court law. There is no federal constitutional law which requires that a jury be provided with witness testimony. See *Bradley v. Birkett*, 192 F. App'x. 468, 477 (6th Cir. 2006). No United States Supreme Court decision requires judges to re-read testimony of witnesses or to provide transcripts of their testimony to jurors upon their request. See *Friday v. Straub*, 175 F. Supp.2d 933, 939 (E.D. Mich. 2001). A habeas petitioner's claim that a state trial court violated his right to a fair trial by refusing to grant a jury request for transcripts is therefore not cognizable in a habeas proceeding. *Bradley*, 192 F. App'x. at 477; *Spalla v. Foltz*, 615 F. Supp. 224, 233-34 (E.D. Mich. 1985). The claim is without merit.

27

3. Denial of Motion for Mistrial

Finally, Petitioner asserts the trial court erred in failing to grant Petitioner's motion for a mistrial after the prosecutor elicited testimony Petitioner provided Vicodin to his employees and the victim. He asserts the failure to grant a mistrial indicates the trial judge was biased against him.

In discussing the related prosecutorial misconduct claim, the Michigan Court of Appeals found a curative instruction was sufficient to remedy any unfair prejudice caused by the improper question:

> Regarding one of the instances of challenged conduct, the trial court instructed the jury to disregard questions relating to defendant providing his work crew Vicodin. That instruction is presumed to have been sufficient to cure any prejudice. *People v. Long*, 246 Mich. App. 582, 588 (2001).

*Beltowski*, 2012 WL 4800241, at *3.

Petitioner fails to cite clearly established Supreme Court law standing for the proposition that a trial judge's decision to remedy an improper question by instructing a jury to disregard the testimony instead of granting a mistrial indicates reversible bias on the part of the trial judge. Indeed, Petitioner cites no authority at all in support of his argument the trial court was required to grant a mistrial to maintain impartiality. See Dkt. 1; Petition, at 41-42.

Petitioner's third claim is therefore without merit.

E. Newly Discovered Evidence

Petitioner next argues he has newly discovered evidence indicating that the high

28

levels of hydrocodone and alprazolam were a significant contributing factor in the victim's death. Specifically, he asserts these drugs suppressed the respiration recovery process that would normally occur after a person loses consciousness. Petitioner supports this allegation with a report prepared by Randall L. Commissaris, an expert in pharmacology and toxicology. Dkt 1., Exhibit D and E. Citing authority from the United States Court of Appeals for the Seventh Circuit, Petitioner asserts the failure to grant a new trial in the face of compelling newly discovered evidence may violate the Due Process Clause. *Moore v. Casperson*, 345 F.3d 474, 491 (7th Cir. 2003), citing *Coogan v. McCarthy*, 958 F.2d 793 (7th Cir. 1992).

This claim is without merit because it cannot be supported by clearly established Supreme Court law. Freestanding claims of actual innocence based on newly discovered evidence are not cognizable on federal habeas review absent independent allegations of constitutional error at trial. See *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007) (collecting cases). Decisions by the Seventh Circuit are insufficient to support a claim for federal habeas relief. "Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context . . . . [P]etitioner's claim is not entitled to relief under available Supreme Court precedent." See *Wright v. Stegall*, 247 F. App'x 709, 711 (6th Cir. 2007).

In any event, Commissaris' opinion that the victim's use of drugs suppressed his ability to start breathing again on his own ignores two key facts. First, Petitioner was the one who strangled the victim and put him in the position of needing to restart his own breathing to survive. Under Michigan law, one "takes his victim as he finds [him],"

29

meaning that "any special susceptibility of the victim to the injury at issue" does not exonerate a defendant. *People v. Fluhart*, 2016 Mich. App. LEXIS 763, *7 n 1 (2016) quoting *People v. Brown*, 197 Mich. App. 448, 451-52 (1992). Second, the evidence indicated that even without the drugs the victim would not have regained consciousness because Petitioner left the strap tightly wound around the victim's neck preventing any blood flow. This claim does not state a basis for granting habeas relief.

F. Prosecutorial Misconduct

Petitioner's next claim asserts three allegations of prosecutorial misconduct. Petitioner claims the prosecutor (1) improperly injected evidence regarding Petitioner providing drugs to his work crew, (2) vouched for the credibility of its witnesses, and (3) argued facts not supported by the evidence.

To be entitled to habeas relief on a prosecutorial misconduct claim, the petitioner must show that the prosecutor's conduct so infected the trial so as to render the conviction fundamentally unfair. *Parker v. Matthews*, 567 U.S. 37 (2012); *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). If the misconduct was harmless, then as a matter of law, there was no due-process violation. See *Greer v. Miller*, 483 U.S. 756, 765 & n.7 (1987). In federal habeas, this means asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); see also *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

After reciting the controlling constitutional standard, the Michigan Court of Appeals rejected each of Petitioner's allegations during his appeal of right. It found the questions regarding the drug use at Petitioner's roofing business and the fact he ran a marijuana grow house did not render his trial unfair because they "were issues inextricably part of defendant's and the prosecution's theories at trial." *Beltowski*, 2012 WL 4800241, at *2. The Court also found the trial court's curative and limiting instructions cured any potential prejudice. *Id.* With respect to the vouching claim, the state court found the projector's statement that Jeffery Moraczewski had nothing to lose by lying because he had already lost his brother was a permitted argument based on the facts of the case. *Id.*, at *2-3. Finally, the state court found the prosecutor improperly argued facts not in evidence by referring to the fact a state trooper had recently been killed by a drive high on marijuana. *Id.* The court, however, found the comment was not sufficiently prejudicial to deny Petitioner his right to a fair trial. *Id.*, at *3.

The state court adjudication of this claim was not objectively unreasonable. As correctly stated by the state court, the comment of the prosecutor did not suggest any hidden knowledge that the victim's brother was testifying truthfully. *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2006). Next, the fact Petitioner and the victim operated the grow house together was a central piece of the factual backdrop of the crime explaining the reason for the confrontation between the two men. While the same is not true with respect to the allegation Petitioner provided pain medications to the victim and his roofing crew, it is difficult to see why this would have necessarily rendered Petitioner's

31

trial fundamentally unfair given the fact the jury was aware that both the Petitioner and the victim were engaged in a marijuana manufacturing operation. Finally, the comment a state trooper had recently been killed by a person high on marijuana was unnecessary and gratuitous, but it was not objectively unreasonable to find this isolated remark did not deny Petitioner his right to a fundamentally unfair trial. See e.g. *Joseph v. Coyle*, 469 F. 3d 441, 474 (6th Cir. 2006). This claim is without merit.

## G. Ineffective Assistance of Trial Counsel

Petitioner next asserts his trial counsel was ineffective for a number of reasons. First, he asserts his attorney failed to object to the introduction of unsolicited testimony from a police officer that Petitioner volunteered to turn himself in until an arrest warrant was issued. He asserts his counsel was ineffective for allowing the defense private investigator to display the victim's militia and military books at the crime scene and then photograph them, allowing the prosecutor to argue they staged the scene. Petitioner asserts counsel was ineffective for failing to object to the alleged prosecutorial and trial judge misconduct discussed above. He asserts his attorney should have hired a toxicology expert as discussed above. And finally, Petitioner asserts his counsel should have objected to the erroneous self-defense instruction.

Under clearly established Supreme Court law, counsel is ineffective when his performance falls below an objective standard of reasonableness and thereby prejudices his client. See *Strickland v. Washington*, 466 U.S. 668, 687-88, 691-92 (1984). To satisfy the performance element, a defendant must point to some action "outside the

32

wide range of professionally competent assistance." *Id*. at 690. To satisfy the prejudice element, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In habeas, a reviewing federal court must apply a doubly deferential standard of review: "[T]he question [under § 2254(d) is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

None of Petitioner's claims merit relief. Petitioner first complains his attorney's questioning of the officer in charge resulted in the unsolicited testimony that Petitioner agreed to turn himself in to police once an arrest warrant was issued:

> Q. (Defense Counsel): Officer, in the conversation I had with you, shortly after the incident, was the contents of the conversation largely, let me know when the warrant issues, we'll turn him in?
>
> A. That was part of it.
>
> Q. But you asked me, would he turn himself in beforehand, right?
>
> A. I asked, I was askin' I needed to talk to him to get his version of the story. And you said you would --
>
> Q. I -- that he would turn himself in when a warrant's [sic] issued, right?
>
> A. Yes.

Dkt. 5-8, at 187).

This was obviously a case of trial strategy. Defense counsel in this passage was trying to establish that Petitioner was cooperative with the police investigation, a point

33

made to support his self-defense claim. The fact that the question included the detail that the turn-over would occur once the warrant issued was a technical one not germane to the point being made, and it is very likely a fine-point that had no impact on the jury. If counsel did not elicit the testimony, he would have missed the opportunity to support his claim that Petitioner cooperated with police. *Strickland* cautions reviewing court's from second-guessing such tactical decisions.

Next, Petitioner asserts his counsel was ineffective for allowing his private investigator to display the victim's militia and military books at the crime scene and then photograph them, suggesting that the victim was a dangerous man. Petitioner asserts this conduct allowed the prosecutor to argue in closing argument that the defense team staged the scene. This was another tactical decision insulated by the *Stickland* standard. The fact that the victim possessed books about guns and similar material supported the defense narrative that he was a "crazy" and violent man. This defense was advanced in part by the private investigator taking photographs of the materials found at the scene. The fact that in order to take the photographs the investigator moved the books around merely allowed for a weak and rather unpersuasive argument that the scene was staged. Counsel was not ineffective for eliciting the investigator's testimony.

Petitioner next asserts his counsel was ineffective for failing to object to the alleged prosecutorial and trial judge misconduct discussed above. But as discussed above, both of these claims are without merit. Counsel cannot be deemed ineffective for failing to raise a meritless objection. See *Bradley v. Birkett*, 192 F. App'x. 468, 475

34

(6th Cir. 2006). Nor is there a reasonable probability the result of the proceedings would have been different had counsel objected to the alleged errors. The allegations that might have drawn a sustained objection–the prosecutor's comment regarding the slain state trooper and the evidence regarding Petitioner supplying drugs to his work crew–were not substantial parts of the prosecutor's case without which there was a reasonable probability of acquittal.

Petitioner next asserts his attorney should have hired a toxicology expert. But as discussed above, the proffered report from Dr. Commissariss states only that the drugs in the victim's system may have prevented him from regaining normal breathing after the victim was strangled to the point of passing out. Dkt. 1, Exhibit D. The report fails to account for the fact that the rifle strap was still tightly constricting the victim's neck after he passed-out. The same thing is true for the expert's opinion that the drugs may have made the victim more aggressive. Even if that is true, the victim was certainly no longer aggressive after he lost consciousness and Petitioner continued to apply pressure for another thirty seconds and then left him helpless with the strap tightly constricting his neck. That is the critical passage of time that turned a case of arguable self-defense into murder. Counsel did not perform deficiently by failing to hire a toxicologist, nor was he prejudiced by the failure to offer the testimony similar to that contained in the Commissariss report.

Finally, Petitioner asserts his counsel should have objected to the erroneous self-defense instruction. But again, for the reasons stated above, there is no reasonable probability that the result of the proceeding would have been different had the

standard jury instruction on self-defense been read to the jury. Given the specific factual scenario involved here–where Petitioner continued to strangle the victim even after he lost consciousness and then left him with his neck still constricted by the strap–the evidence did not support a self-defense claim, and there is no reasonable probability he would have been acquitted on that basis even if the slight errors in the instructions discussed above had been cured.

Petitioner has failed to demonstrate that he was denied the effective assistance of trial counsel.

H. Evidentiary Hearing

Finally, Petitioner requests an evidentiary hearing. The request is stated broadly. He does not state which claims require a hearing or what evidence he wishes to present. Nevertheless, in *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held that a federal court's review of a state court decision is limited to the record that was before the state court because the federal habeas scheme was designed to leave "primary responsibility with the state courts." *Id*. at 181-82. Consequently, "[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo."*Id*. at 182. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did.*" Id*.

Because the Court has determined that Petitioner's claims are without merit even considering the evidence proffered to the state courts, he is not entitled to an

36

evidentiary hearing in this Court.

Because all of Petitioner's claims are without merit, the petition will be denied.

## IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11, Rules Governing Section 2254 Proceedings. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted). Here, jurists of reason would not debate

the Court's conclusion Petitioner has not met the standard for a certificate of appealability with respect to all but one of his claims because they are completely devoid of merit. The Court finds, however, that jurists of reason could debate whether Petitioner is entitled to relief on his jury instruction claim. Therefore, the Court grants a certificate of appealability only with respect to Petitioner's claim that the trial court's erroneous jury instruction on self-defense denied Petitioner a right to fair trial and had a substantial impact on the verdict.

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, 2) **GRANTS** a certificate of appealability with respect to Petitioner's jury instruction claim, but 3) **DENIES** a certificate of appealability with respect to his other claims.

s/John Corbett O'Meara
United States District Judge

Date:  November 14, 2017

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, November 14, 2017, using the ECF system and/or ordinary mail.

s/William Barkholz
Case Manager